The Bowersock Mills & Power Co. v. Commissioner.
Bowersock Mills & Power Co. v. Commissioner
Docket No. 9186.
United States Tax Court
1947 Tax Ct. Memo LEXIS 59; 6 T.C.M. (CCH) 1106; T.C.M. (RIA) 47290; October 16, 1947
*59 Held, that certain obligations of the petitioner constituted preferred stock rather than indebtedness and that the amount accruing and paid on such obligations during the taxable year constituted the distribution of a dividend on preferred stock. John G. Madden, Esq., and James E. Burke, Esq., for the petitioner. George E. Gibson, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion TYSON, Judge: The respondent determined a deficiency of $5,675.67 in the income tax of petitioner for the fiscal year ended May 31, 1943. In its petition the petitioner assigned error in respondent's determination that there was an overassessment for the taxable year ended May 31, 1942, but at the hearing a motion was filed by the respondent to dismiss the proceedings for that *60 year for lack of jurisdiction, which motion was granted with the assent of petitioner. The sole issue presented is whether respondent erred in failing to allow petitioner an interest deduction for the fiscal year ended May 31, 1943. Other adjustments in the deficiency notice are not in controversy. The interest deduction originally claimed was in the amount of $36,000, but this amount was reduced to $18,000 by petitioner on brief. Findings of Fact The petitioner is a corporation organized under the laws of the State of Kansas and has its principal office and place of business at Lawrence, Kansas. It is engaged in handling grain and operating a flour mill and water power plant. It filed its income tax return on the accrual basis for the fiscal year ended May 31, 1943, with the collector of internal revenue at Wichita, Kansas. Petitioner keeps its books and files its returns on the accrual basis. Petitioner was incorporated in the latter part of 1928 and has operated as a corporation since January 1, 1929. From 1905 to 1922 the business had been operated by R. C. Jackman and J. D. Bowersock, Sr. as equal partners. After the latter's death, in 1922, Jackman and members of his family, *61 consisting of his wife and four children, purchased the interest of the J. D. Bowersock, Sr.'s estate (hereinafter referred to as the Bowersock Trust) and operated the business until its incorporation, at which time the Jackmans were still indebted to the Bowersock Trust for $550,000 on the purchase price of the estate's interest. The original capital stock of petitioner was 6,000 shares common stock at $100 par value per share, all of which was issued to Jackman and the five members of his family. In lieu of the indebtedness of the Jackman family to the Bowerstock Trust, petitioner at the time of its incorporation issued to the Bowerstock Trust first mortgage bonds in the principal amount of $550,000, which were secured by a first deed of trust covering the physical assets of petitioner. The bonds were dated January 1, 1929 and matured in principal amounts of $80,000 on the first day of January 1938, 1939, 1940, 1941, and 1942, and $150,000 on January 1, 1943. They bore interest at the rate of five per cent per annum until January 1, 1933, five and one-half per cent per annum from January 1, 1933 to January 1, 1938, and six per cent per annum thereafter until paid. Interest was *62 to be paid annually for the first two years on January 1, 1929 and 1930 and semi-annually thereafter on January 1 and July 1 in each year. The petitioner defaulted on the interest payment in 1935 and continued to default on the interest payments thereafter. On January 1, 1938, petitioner defaulted on the payment of principal due on that date. In operating its business petitioner required bank credit, both open line credit and credit secured by its bills of lading and warehouse receipts. From 1935 to 1938 petitioner did business with the First National Bank of St. Louis, Missouri. After defaulting on the principal payment due on its bonds on January 1, 1938, petitioner was no longer able to obtain credit from the First National Bank of St. Louis, or any other bank, or banks; and the situation became acute during the wheat season of 1938. The matter of the default and its effect on petitioner's credit position was discussed with the trustees of the Bowersock Trust over a period of two or three months during the fall and early winter of 1938, and the trustees after having the whole situation laid before them felt that unless the credit situation was improved there could be no adequate *63 payment on their bonds, since credit was essential to the successful operation of petitioner's business. The position of the trustees throughout the negotiations was that they desired the matter to be worked out without the necessity of their having to take over the management responsibilities; and those trustees never actually participated in the management. In order to reestablish the petitioner's credit at the banks and enable petitioner to continue in business it was decided by the trustees of the Bowersock Trust and the petitioner that preferred stock should be issued to take the place of the bonds, after amendment of the charter reducing the common stock from $600,000 to $300,000 and authorizing the issue of 6,000 shares of preferred stock. As a result of the discussions between petitioner and the trustees a written agreement was entered into by them as of January 1, 1939. That agreement provided, in pertinent parts, as follows: "1. WHEREAS, parties of the first part [Trustees] are now the owners of first mortgage bonds of the party of the second part, [Petitioner] in the amount of $550,000.00, with accrued interest thereon, and the parties are desirous to change the *64 form of said indebtedness so that the said first mortgage may be released and the capital structure of the party of the second part improved, and for that purpose it is proposed to issue six thousand shares of preferred stock of the Company, as hereinafter described, 5500 shares of which shall be issued in payment of the principal of said bonds and in consideration of the release of said mortgage, and 500 shares of which shall be issued to evidence an equal amount of interest now due, and to issue notes of the Company to evidence the remainder of said interest, as set out in paragraph 3 hereof: "NOW, THEREFORE, it is hereby agreed between the parties as follows: "2. The party of the second part shall cause its charter to be amended to provide for the reduction of the common stock to 3,000 shares of the par value of $100.00 per share, being in the total amount of $300,000.00, which common stock shall be entitled to all voting rights, except as hereinafter provided and for the issuance of 6,000 shares of preferred stock of the par value of $100.00 per share, being in the total value of $600,000.00. Said amendment shall provide that said stock shall be preferred both as to dividends *65 and assets; shall bear cumulative annual dividends of 3 per cent, payable on December 31st of each year, except as hereinafter in this paragraph provided; and that said preferred stock shall have no voting rights except upon any and all questions as to: The sale, mortgage or pledge of all or any substantial part of the fixed assets of the corporation; the dissolution or discontinuance of the corporation; the merger or consolidation of the corporation with any other corporation; any amendment of or change in the articles of incorporation; any action to be taken by the corporation to effect a reorganization or to be taken in pursuance with the bankruptcy laws of the United States or relating to the appointment of a receiver; as to which matters the holders of preferred stock shall be entitled to equal voting rights with the holders of common stock. It shall be subject, in whole or in part, to retirement at par and accrued dividends on the 31st day of December in any year upon call by the Company thirty days prior to said date. It shall also provide that no debenture bonds, and no mortgage or other lien on its fixed assets shall be issued by said Company, without the consent of the holders *66 of all the preferred stock. It shall further provide that no dividends shall be paid on the common stock until all current and cumulated dividends, if any, have been paid on the preferred stock. If dividends are at any time declared upon the common stock in any year, in excess of 3 per cent, the holders of preferred stock shall be entitled to and the Company shall declare and pay upon said preferred stock, in addition to the preferential 3 per cent, an additional dividend at a rate equal to one-half of the rate declared upon the common stock for such years in excess of 3 per cent. "3. Upon the performance by party of the second part of the provisions of paragraph 2 hereof, and the delivery of the certificates for said preferred stock, issued to them or their order, together with four notes of the Company, in the aggregate amount of $58,000.00, payable to parties of the first part, with interest at the rate of 3 per cent per annum, payable semiannually, all said notes to be dated January 1, 1939, one for $10,000.00 due on or before December 31, 1939, one for $16,000.00, due on or before December 31, 1940, one for $16,000.00, due on or before December 31, 1941, and one for $16,000.00 *67 due on or before December 31, 1942, said stock and notes evidencing the adjusted obligation of party of the second part to parties of the first part, said parties of the first part agree to release of record the first mortgage referred to in paragraph 1 hereof, and cancel and surrender to the party of the second part the first mortgage bonds secured thereby in the amount of $550,000.00 and release said mortgage of record. * * *
"5. Party of the second part shall cause dividends on the preferred stock to be declared and paid each year, if the net earnings at the time are sufficient to pay such dividends, unless parties of the first part consent that such payment may be postponed. No dividends shall be at any time declared and paid on the common stock until the notes herein provided for shall be paid in full, without the consent of the holders of said preferred stock. * * *
"8. Except in the ordinary and usual course of business, the party of the second part will not sell, assign or transfer any substantial portion of its assets, or merge or consolidate with any other firm, partnership or corporation without the consent of parties of the first part." * * *
The charter *68 of petitioner was amended, the certificates of preferred stock were issued to the Bowerstock Trust, and the bonds were cancelled, all as provided for in the above agreement. The certificates of preferred stock were each, in material part, as follows: "THIS CERTIFIES, that is the owner of shares of the Preferred Stock of The Bowersock Mills & Power Company, hereinafter called the 'Company', transferable only on the books of the Company by the holder hereof, in person or by duly authorized attorney, upon the surrender of this certificate properly endorsed. Under the Articles of Association as amended, the Common Stock is subordinate to the rights of the holders of Preferred Stock in the following particulars: Such Preferred Stock is preferred both as to dividends and assets; it bears cumulative annual dividends at the rate of 3 per cent per annum, payable December 31st of each year, with additional dividends of one-half of the rate paid in any year upon the Common Stock in excess of 3 per cent per annum; it is subject to retirement at par and accrued dividends on December 31st in any year upon call thirty days prior to said date; it confers no voting rights upon the holder hereof, *69 except upon questions as to the sale, mortgage or pledge of all or any substantial part of the fixed assets, the dissolution, discontinuance, merger or consolidation of the Company, changes and amendments in the Articles of Association and bankruptcy, reorganization and receiverships. No debenture bonds or mortgage or other lien on fixed assets may be issued by the Company without the consent of the holders of all the Preferred Stock. No dividends may be paid on the Common Stock until all current and cumulative dividends are paid on the Preferred Stock." Subsequent to the issuance of the preferred stock and the cancellation of the bonded indebtedness, the petitioner had no further difficulty in securing bank credit. On January 1, 1939, the trustees and all the holders of petitioner's common stock executed a written agreement wherein it is stated, inter alia: "WHEREAS, parties of the first part [the trustees] are now the owners of first mortgage bonds of said Bowersock Mills & Power Company, in the amount of $550,000.00, with accrued interest thereon, and parties of the first part have adjusted said indebtedness with said Company, and have agreed to accept six thousand shares *70 of preferred stock to be issued by said Company, five thousand five hundred shares in payment of the principal of said bonds, and five hundred shares representing a part of the accrued interest thereon, and four notes of the Company aggregating $58,000.00 in adjustment of the remainder of said accrued interest; "NOW, THEREFORE, it is agreed as follows: * * *" Under the agreement the trustees agreed to sell to the common stockholders and the common stockholders agreed to purchase from the trustees the 6,000 shares of preferred stock (of the par value of $100 per share) at the price of $540,000, as follows: "2. Party of the second part [the common stockholders] agrees that, beginning with January 1, 1944, he will purchase of the preferred stock of said Bowersock Mills & Power Company, to be presently issued in the total amount of $600,000.00, shares of such preferred stock at Ninety Dollars ($90.00) per share, and will continue to purchase on January 1 of each succeeding year shares of said preferred stock at said price, in such number that the total annual payment to said parties of the first part of dividends and purchase price will amount to not less than Thirty-one Thousand *71 Five Hundred Dollars ($31,500.00) per year. "3. It is understood and agreed that party of the second part shall not be liable personally for any of the provisions of this contract. In consideration of this freedom from personal obligation, and to insure the performance of this agreement and of the agreement between parties of the first part and said Bowersock Mills & Power Company, by all parties, party of the second part shall transfer or cause to be transferred at the time this contract takes effect, to the Lawrence National Bank, of Lawrence, Kansas, and parties of the first part shall likewise, at the same time, transfer to or cause to be issued, in the name of said bank, both in trust as hereinafter stated, all the common and preferred stock of said Bowersock Mills & Power Company, except sufficient shares to quality directors, the certificates for which qualifying shares shall be endorsed in blank and deposited with said bank, together with their resignation or resignations as directors and officers, if they or any of them be officers, said resignations to take effect when and if first parties shall become entitled to the transfer of the common stock as hereinafter provided. *72 In case of the failure on the part of said party of the second part, for a period of six months, to make or cause to be made by said company any payment provided for in paragraph two hereof, or any payment of or upon the notes of the company provided for in paragraph two hereof, or any payment of or upon the notes of the company provided for in the agreement between parties of the first part and said Company, or to perform any of the requirements of paragraph six hereof, then said common stock shall upon demand of the parties of the first part, be immediately assigned and transferred by said bank to parties of the first part absolutely as liquidated damages and not as a penalty, and party of the second part shall immediately, upon presentation of the certificates for such common stock, cause said stock to be transferred on the books of the Company and new certificates to be issued to parties of the first part, with all the powers of holders of common stock in said Company. The party of the second part shall have a period of eighteen months after such default (including the above-mentioned period of six months) to re-establish his position and rights under this agreement, remedying *73 such default and by paying to first parties the full amount in default under the terms hereof at the time of such re-establishment with interest at 4 per cent. If such performance and payment is made within said period, said common stock shall be re-transferred to said Lawrence National Bank to be held by it under the terms hereof, with the same effect as if there had been no default, and the party of the second part shall resume the management and control of said corporation. If said position and rights are not so re-established within said eighteen months, then all rights of the party of the second part hereunder shall thereupon cease and determine, and said party of the second part shall have no claim upon or interest whatsoever in either the common or preferred stock of said Company, except a beneficial interest in such amount of preferred stock as may then have been paid for by him under the terms hereof, as provided in paragraph 4 hereof. Thereupon, the trust provided for herein shall cease and the preferred stock held by said Bank shall be transferred to the holders of the trust certificates upon surrender of said certificates to and cancellation thereof by said bank. This paragraph *74 shall not affect in any way the obligation of said Company upon its notes described in the preamble hereof. "4. Upon the payment of any amounts provided herein to be paid on the purchase price, parties of the first part shall execute and deliver to the Lawrence National Bank, as Trustee, an assignment and transfer of the beneficial interest in the number of shares of said preferred stock so paid for, to be held in trust for party of the second part under this agreement, providing that all dividends accrued or accumulated upon said preferred stock held by said bank for second party shall be forthwith paid over to said parties of the first part and applied on said purchase price of said preferred stock as a part of the amounts to be paid as provided in paragraph 2 hereof. Upon payment in full of said purchase price, of the notes referred to in paragraph 3 hereof as therein provided, and of all dividends to the date of such full payment on the preferred stock held by said bank for parties of the first part, all said preferred stock, as well as the common stock, shall be held for and delivered to the then holders of trust certificates issued under paragraph 7 hereof. * * *
"6. *75 The party of the second part further agrees: to cause the Company to perform the provisions of the agreement dated January 1, 1939, between parties of the first part and the Bowersock Mills & Power Company, as approved by the Kansas Corporation Charter Board where necessary, as long as, and whenever party of the second part has hereunder the power to control the voting of the stock of the Company; * * *" Of the amount of $31,500 to be paid by the common stockholders as provided in paragraph 2 of the above agreement, $13,500 was for the purchase of preferred stock. The Lawrence National Bank, as trustee, in the immediately foregoing agreement, was, under paragraph 7, to issue "Trust Certificates" to each of the owners of preferred and common stock, respectively, for the stock deposited with it and which was to be held and used by it as prescribed in the agreement. Both of the agreements of January 1, 1939 were drafted by Justin D. Bowersock, Jr. who was an attorney and also one of the trustees of the Bowersock Trust. The petitioner was not represented by an attorney in the drafting of its contract with the trustees and the common stockholders were not represented by an attorney *76 in the drafting of their contract with the trustees. A sheet from petitioner's ledger entitled "NOTES PAYABLE M.G. & J. D. BOWERSOCK Trust" shows credit entries of December 16, 1942 of $18,000 for 1941 and $18,000 for 1942 as "Preferred Stock Int", and a journal voucher of petitioner of December 16, 1942 shows similar entries under the heading "General Ledger". This journal voucher also contained: "The following entries to set up preferred stock dividends for 1941 and 1942 Charge Interest 18,000.00 Credit Bowersock Trust 18,000.00". On "Schedule M. - RECONCILIATION OF NET INCOME AND ANALYSIS OF EARNED SURPLUS AND UNDIVIDED PROFITS" of its income tax return for the year ended May 31, 1943, petitioner reported $36,000 as "Total distributions to stockholders charged to earned surplus during the taxable year". On August 10, 1944, petitioner filed a claim for refund in the amount of $14,790, one of the grounds upon which the claim was based being that the $36,000 represented interest in indebtedness. The amount of tax shown to be due on petitioner's return for the taxable year was $38,845.82, and this amount was paid in installments on August 15, 1943, November 12, 1943, February 13, 1944, and *77 May 13, 1944. The petition herein was filed on September 19, 1945. In his notice of deficiency the respondent denied petitioner's claim for refund, holding the claimed deduction "to be dividends paid on preferred stock and not interest allowable as a deduction under the provisions of Section 23(b) of the Internal Revenue Code". Opinion The questions presented by the issue and contentions of the parties are: (a) whether the terms of the preferred stock and those of the two contracts of January 1, 1939, (one of the contracts being between the petitioner and the Bowersock trustees, and the other being between the common stockholders of petitioner and the trustees) are to be treated as constituting one integrated and indivisible transaction and, if so treated, whether they establish that the $18,000 involved constituted interest on indebtedness, as contended by petitioner, or dividends on preferred stock, as contended by respondent; and (b) whether the terms of the agreement between petitioner and the trustees together with the terms of the preferred stock and extrinsic evidence and without consideration of the terms of the agreement between the trustees and *78 the common stockholders had the effect of establishing that the $18,000 constituted interest on indebtedness, as contended by petitioner, or dividends on preferred stock, as contended by respondent. As to question (a) above, we think we are precluded, under the facts and circumstances of this case, from considering as a factor the terms of the agreement between the common stockholders and the trustees of the Bowersock Trust in deciding whether the $18,000 involved is interest or dividends. Although the two agreements were executed on the same day, the agreement between the trustees and the petitioner, the intention of which we must determine, makes no mention of the agreement, or any of its terms, between the trustees and the common stockholders; and the latter agreement makes no reference to the former agreement, except: (1) that in the preamble to the latter agreement it was recited that the preferred stock which the trust was agreeing to sell the common stockholders was to be "presently issued to" the trust under its contract with the petitioner; and (2) that "to insure the performance of this agreement and of the agreement between parties of the first part [the trustees] and *79 said Bowersock Mills & Power Company", the common stockholders should transfer their common stock to the Lawrence National Bank, in trust, to be transferred upon demand to the trust as liquidated damages upon failure for six months of the common stockholders, in certain particulars, to perform their contract or upon failure of the common stockholders "to cause the [petitioner] to perform the provisions of [its] agreement dated January 1, 1939, between the [trustees] and the [petitioner] * * * as long as, and whenever [the common stockholders] have hereunder the power to control the voting of the stock of the Company". The above references in the agreement between the trustees and the common stockholders to the agreement between the trustees and the petitioner could have no greater effect than that the common stockholders guaranteed the performance by the petitioner of its contract with the trustees to the extent that they would forfeit their common stock in case of failure of petitioner, for six months, to so perform while the particular common stockholders were in control of the petitioner. The agreement between the common stockholders and the trust was, in our opinion, *80 merely a contract for the sale and purchase of the preferred stock together with the guarantee mentioned, and the provisions of that contract are not factors in determining the question of what the intentions of the petitioner and the trust were in the contract executed between themselves. See Hazel Atlas Glass Co. v. Van Dyk & Reeves, 8 Fed. (2d) 716; Northern Refrigerator Line, Inc., 1 T.C. 824; and Verifine Dairy Products Corporation of Sheboygan, 3 T.C. 269. It may be further said that no extrinsic evidence satisfactorily shows that the execution of the one contract was dependent upon the execution of the other; and even if by inference such evidence might so indicate such would not, without more, establish that the two contracts constituted one integrated transaction, as contended by petitioner. The petitioner cites as supporting the view that the terms of the contract between its common stockholders and the trust are to be considered as factors in determining the intention of the petitioner and the trustees of the Bowersock Trust in the other contract even though the two contracts were between different parties, Peterson v. Miller Rubber Co. of New York, 24 Fed. (2d) 59; *81 and Doheny v. United States Fidelity & Guaranty Co., 34 Fed. Supp. 888. The Peterson case was a suit brought against the principal and sureties on a bond for default in performance of a contract by the principal. On the same date the bond was executed the principal had executed the contract for the performance of certain duties. That contract required the execution of a bond for the proper performance of the duties. Such bond was executed as principal by the party who was to perform the duties and two sureties. The bond referred to the contract and a copy of the contract was attached to the bond and made a part thereof. The Circuit Court of Appeals in affirming a judgment against the principal and sureties on the bond applied the terms of the contract and those of the bond. It is obvious that it was necessary to construe the terms of the contract and the bond together, since to recover on the bond it was necessary to show default in the contract, - and in what respects. The case is not apposite here as supporting the view of petitioner that the terms of the contract between it and the trustees and the terms of the contract between its stockholders and the trustees must *82 be construed and applied as if they constituted one indivisable and integrated contract. Doheny & United States Fidelity & Guaranty Co., supra, is likewise not apposite and for similar reasons. We will now consider question (b) presented above. Notwithstanding that the agreement between petitioner and the trustees of the Bowersock Trust recites that, "WHEREAS, parties of the first part [Bowersock trustees] are now the owners of first mortgage bonds of [petitioner] in the amount of $550,000.00, with accrued interest thereon, and the parties are desirous to change the form of said indebtedness so that the first mortgage may be released and the capital structure of the [petitioner] improved", and notwithstanding one of the trustees, who drafted the agreement, and the president of petitioner, testified that the quotation represented the gist, or substance, of what the parties contemplated in the preliminary discussions, we must nevertheless, in determining the intention of the parties, look for aid to other provisions of the agreement as well as the provisions of the stock certificates - having in view that where the recitals in a contract are inconsistent with its *83 operative terms and such inconsistencies can not be harmonized the operative terms, if unambiguous, will prevail. See 17 C.J.S. p. 733, [*] 314. The agreement provided, in paragraph 2 thereof, that the preferred stock "shall be preferred both as to dividends and assets; shall bear cumulative annual dividends of 3 per cent, payable on December 31st of each year, except"; that "If dividends are at any time declared upon the common stock in any year, in excess of 3 per cent," the preferred stockholders would be entitled to a further dividend of one-half of such excess. Similar provisions appear in the stock certificates. The agreement further provided, in paragraph 5, that petitioner "shall cause dividends on the preferred stock to be declared and paid each year, if the net earnings at the time are sufficient to pay such dividends, unless [the trustees] consent that such payment may be postponed". All these provisions of the agreement, especially that showing that dividends were to be paid only out of earnings, are marked indicia of stock ownership in the Bowersock Trust, rather than of an indebtedness to that trust. Haffenreffer Brewing Co., 41 B.T.A. 443, 451, and *84 authorities cited therein; affirmed, 116 Fed. (2d) 465 certiorari denied, 313 U.S. 567; Commissioner v. Meridian & Thirteenth R. Co., 132 Fed. (2d) 182; and Northern Refrigerator Line, Inc., 1 T.C. 824, 828. The agreement, in paragraph 2, provided that the preferred stock "shall be subject, in whole or in part, to retirement at par and accrued dividends on the 31st day of December in any year upon call by the Company thirty days prior to said date". A similar provision appears in the stock certificates. This provision shows conclusively that the preferred stock had no definite maturity date, since its retirement was wholly contingent upon the discretion of the petitioner. This is further marked indicia of stock ownership in the Bowersock Trust rather than an indebtedness of petitioner to that trust. United States v. South Georgia Ry. Co., 107 Fed. (2d) 3, 5, and authorities cited therein; Haffenreffer Brewing Co., supra; First Mortgage Corp. v. Commissioner, 135 Fed. (2d) 121; Jewel Tea Co. v. United States, 90 Fed. (2d) 451; Golden Belt Lumber Co., 1 T.C. 741; and *85 Ticker Publishing Co., 46 B.T.A. 399, 410. The agreement further provided, in paragraph 2, that the preferred stock should have voting rights upon all questions as to: "The sale, mortgage or pledge of all or any substantial part of the fixed assets of the corporation; the dissolution or discontinuance of the corporation; the merger or consolidation of the corporation with any other corporation; any amendment of or change in the articles of incorporation; any action to be taken by the corporation to effect a reorganization or to be taken in pursuance with the bankruptcy laws of the United States or relating to the appointment of a receiver; as to which matters the holders of preferred stock shall be entitled to equal voting rights with the holders of common stock." A similar provision appears in the stock certificates. This provision giving voting rights is also marked indicia of stock ownership in the Bowersock Trust rather than an indebtedness to it. Drayton Mills, 19 B.T.A. 76. "* * * voting powers are not usually incidental powers granted under creditor instruments". Mertens Law of Federal Income Taxation, Vol. 4, page 557. Another indicium of *86 stock ownership in the Bowersock Trust is that its agreement with petitioner designated the shares throughout as preferred stock, as did the stock certificates themselves. While this designation is not determinative, it is not to be disregarded. First Mortgage Corp. v. Commissioner, supra; Commissioner v. Proctor Shop, 82 Fed. (2d) 792; and United States v. Title Guarantee & Trust Co., 133 Fed. (2d) 990, and authorities cited therein. So far then as the provisions of the certificates of preferred stock and those of the agreement between petitioner and the trustees are concerned, we are of the opinion that taking all the indicia of stock ownership together the $18,000 here involved constituted dividends upon preferred stock held by the Bowerstock Trust rather than interest on indebtedness from petitioner to those trustees, since the operative terms of the agreement show clearly that the obligation of the petitioner from which the $18,000 income was derived was preferred stock, and such operative terms must prevail over the recitals in that agreement. We conclude that the $18,000 involved constituted distributions of dividends on preferred stock *87 and not interest on an indebtedness. There is nothing in the evidence aliunde the agreement between the trustees of the Bowersock Trust and petitioner and the certificates of preferred stock which would justify a different conclusion. The facts shown in our findings, that during the period of negotiations the trustees did not wish to take over the management responsibilities of petitioner and that they never participated in such management are immaterial, and, moreover, under their contract with petitioner, the trustees in accordance with their wishes were not required to take over such management or to participate therein. Neither do we think the fact that, as testified to by its president, the petitioner, in 1944, paid $13,500 as purchase price of preferred stock due the trust from the common stockholders in that year, or the fact that petitioner, as indicated by its ledger and journal voucher entries, in 1942, paid $18,000 for each of the years 1941 and 1942 as "PREFERRED STOCK INT." under the contract between the trustees of the Bowersock Trust and the common stockholders impairs the soundness of our conclusion. Such payments would have little, if any, significance as indicating *88 that they were for interest on an indebtedness of the corporation, since such payments, the reasons therefor not being shown, might conceivably and reasonably have been made by petitioner for the convenience of the stockholders at their behest, they being in absolute control of petitioner and its operations, so far as its performance of such acts are concerned. It is true that J. D. Bowersock, Jr., one of the trustees of the Bowersock Trust, testified, with regard to the discussions preliminary to the execution of the agreements between the trustees and petitioner and while the bonds were outstanding, as shown by questions and answers thereto as follows: "Q. And you were interested, of course, in getting your money? A. Yes, nothing else. Q. When you say 'nothing else', you weren't interested in going back in equity participation? A. That is right, definitely. * * *
Q. From the beginning to the end of these negotiations, Mr. Bowersock, did you have in mind, as you expressed it, a change in the form of this situation of your indebtedness which would permit both the company to earn the interest and for you to have the interest paid and the indebtedness eventually retired? *89 A. That was distinctly in my mind * * * [and] was discussed [between Mr. Jackman and Bowersock, Jr.] [Brackets supplied.]" Bowerstock also testified: "I think the intention of the agreement was to accomplish the best results for securing our investment and our indebtedness and keeping the company on its feet.' This testimony is a far cry from constituting proof that the intention of the agreement between petitioner and the trustees of the Bowersock Trust was that the obligations of petitioner thereunder were those of a debtor rather than those of an issuer of preferred stock; especially in view of the unequivocal terms and provisions of that agreement. Brush-Moore Newspapers, Inc., 37 B.T.A. 787, relied upon by petitioner is distinguishable in that there "The payments in question" were made "under the terms of the resolution of petitioner's board of directors adopted coincidentally with the issuance of the shares" and in that there it was said that "From the wording of the resolution it is apparent that the corporation had to guarantee [the holder of second preferred stock] against the possibility that he might lose either principal or interest by reason *90 of his surrender of the notes for second preferred stock". Such is not the situation here, for the petitioner did not guarantee the Bowersock trustees against loss of either principal or interest. In Arthur R. Jones Syndicate v. Commissioner, 23 Fed. (2d) 833; Commissioner v. Proctor Shop, supra; and United States v. Title Guarantee & Trust Co., supra, the facts are so different in vital respects from those here as to render the citations inapposite in view of the rule that, generally, each case of this character must be decided upon its own particular facts. The action of the respondent in failing to allow the claimed deduction is approved. Decision will be entered for the respondent.